966 F.2d 1454
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ken Lloyd ADAMS, Defendant-Appellant.
 No. 91-3859.
 United States Court of Appeals, Sixth Circuit.
 May 29, 1992.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges, and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Defendant, Ken Lloyd Adams, was convicted of conspiracy to possess with intent to distribute over fifty grams of cocaine base, 21 U.S.C. § 846, and possession with intent to distribute over five grams of cocaine base, 21 U.S.C. § 841(a)(1).
 
 
 2
 On appeal, Adams challenges the sufficiency of the evidence to support the convictions. He also claims that damaging hearsay evidence was improperly admitted. Finally, Adams argues that, at sentencing, the four-level upward adjustment in his offense level for being a leader/organizer was improper.
 
 
 3
 Our review of the record convinces us that the verdict and sentence should be affirmed.
 
 I.
 The Sufficiency of the Evidence
 
 4
 We first turn our attention to the conspiracy conviction. We find it unnecessary to review in any detail the evidence against Adams on this count because the thrust of Adams' argument is really directed at attacking the credibility of the witnesses who provided the evidence. Most of the damaging evidence against Adams came from his associates in the narcotics trade who were cooperating with the government for their own gain. However, the jury was made fully aware of these facts and resolved the credibility issue in favor of the testifying witnesses. This is not at all surprising in light of the number of witnesses who testified, the nature of their testimony, and the length and extent of this drug distribution conspiracy.
 
 
 5
 Adams was running for a number of years the now classic "hit and run" crack house operation. He would secure the use of premises from persons, who often were addicts themselves, in return for cash or crack cocaine. Since the sale of crack generally involves numerous small purchases, the traffic that a crack house generates soon calls attention to the location. The trick is to move before the police gather enough hard evidence to secure a search warrant. As this record reflects, sometimes Adams moved in time and sometimes he did not.
 
 
 6
 Witnesses testified as to at least ten different crack house locations which were secured by Adams and which he supervised. Adams went to New York to get his supply of crack cocaine, supplied the various crack house locations, and then collected the sale proceeds. A typical day's sales would generate $5,000.
 
 
 7
 Adams makes much of the fact that, except for one instance, he was not present at any of the crack houses when they were raided by the police. He also argues that he was never found with drugs on his person in any of his brushes with the law. Although these contentions are accurate, Adams completely ignores the highly incriminating testimony of those with whom he allied himself in this criminal venture. The government characterizes the evidence against Adams as overwhelming. We agree.
 
 
 8
 We turn now to the possession with intent to distribute count. When Adams was arrested, he was a passenger in an automobile which was owned by someone other than himself. Rocks of crack cocaine were found in a napkin tucked under the console between the driver and passenger seats. Adams argues that, since the car was not his and the cocaine was not on his person, the evidence was insufficient to support a conviction. This version of the arrest leaves out critical facts. On the day of the arrest, Adams and one of his associates, John Williams, asked Alfred Otey to give them a ride to Adams' residence on Lockbourne Road. Adams told Otey that Adams had to go to one of his crack houses to retrieve drugs. On the way over to Lockbourne Road, the three stopped so that John Williams could pick up another car. Adams and Otey stayed in Otey's car. At one point during the trip, both cars stopped, and Otey pulled his car next to Williams' car. At that time, Williams got out, came over to Adams, and handed him a napkin that contained crack. After this exchange, narcotics officers stopped the car in which Adams was a passenger.
 
 
 9
 The officers identified themselves to Adams and Otey and yelled at them to put up their hands. The driver of the car, Otey, put up his hands immediately, but Adams did not obey the orders. The officers repeatedly shouted at Adams to put up his hands. While they were shouting at him, Adams was bent over as if he were reaching for something or hiding something. After Adams finally complied with the orders to put up his hands, the officers then removed both Otey and Adams from the car. The officers then searched the car and found a napkin containing crack along the side of the passenger seat.
 
 
 10
 We review sufficiency of the evidence claims under the standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). The evidence must be viewed in the light most favorable to the government. We then determine if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Applying this test here, we conclude that the jury properly found Adams guilty on the possession charge.
 
 II.
 The Hearsay Issue
 
 11
 We reject Adams' claims of error on this issue for two reasons. First, if we were to credit each instance pointed out by Adams as an alleged violation of the hearsay rule and consider them cumulatively, we would still conclude that such evidentiary errors were harmless as a matter of law due to the overall strength of the government's case against Adams.[1]
 
 
 12
 Second, many of the alleged evidentiary errors were not errors at all, but rather involved statements which were not hearsay by definition. Many of the statements objected to involved statements made by Adams himself or by one of his codefendants during the course of and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(A) and (E).
 
 
 13
 Adams appears to argue that much of the allegedly objectionable testimony from co-conspirators was obtained before it was clearly established that there was a conspiracy. Assuming this to be true, no error results. A trial judge may admit co-conspirators' testimony as long as the government ultimately shows by a preponderance of the evidence that a conspiracy existed and that the statements in question were made during and in furtherance of the conspiracy. United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980). In a case in which a conspiracy is charged and proved, as is the case here, there is less likely to be a Vinson problem.[2] The government, of course, proceeds at its peril in offering evidence which is only conditionally admitted.
 
 
 14
 The trial judge rejected some of the evidence objected to and gave cautionary instructions. The evidence which was admitted over objection was found by the judge to come from persons who were co-conspirators and involved statements made during the course of and in furtherance of the conspiracy. We agree.
 
 III.
 The Sentencing Issue
 
 15
 The United States Sentencing Guidelines provide, in section 3B1.1(a), that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the base offense] by 4 levels." In determining whether five or more persons were involved, the trial judge may include persons not indicted or convicted if they are shown to be criminally responsible. U.S.S.G. § 3B1.1, comment. (n. 1). The defendant may also be included as one of the five participants. United States v. Barbontin, 907 F.2d 1494, 1498 (5th Cir.1990).
 
 
 16
 In reviewing a trial court's decision to enhance a defendant's offense level because of a leadership role, we apply an abuse of discretion standard. United States v. Castro, 908 F.2d 85, 90 (6th Cir.1990). Little need be said further on this issue since, in large measure, it is subsumed by our conclusion that the evidence was sufficient to support the convictions. The evidence that detailed Adams' role in the crack house operations, which the jury found sufficient beyond a reasonable doubt for conviction, is also the evidence that clearly indicates he was an organizer and leader of a crack distribution operation that involved more than five persons. Its adequacy for this purpose is particularly apparent since the leadership finding need be established only by a preponderance of the evidence.
 
 
 17
 We can find no error in the trial judge's conclusion that the four-level enhancement was appropriate and mandated by the Guidelines.
 
 
 18
 AFFIRMED.
 
 
 
 *
 Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The hearsay issue relates primarily to Adams' conviction on the conspiracy count
 
 
 [2]
 We note, however, that a jury finding a defendant guilty on a conspiracy count does not automatically answer the question of whether the challenged statements were made during the course and in furtherance of the conspiracy